## Miller, Appellant, v. Carey.

Argued November 20, 1934.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*Thomas Ross,* for appellant.

*Myron W. Harris,* and with him *Isaac J. Vanartsdalen,* for appellee.

Opinion by Cunningham, J., March 13, 1935:

While William L. Miller, plaintiff below and appellant herein, was walking, within the limits of the Borough of Riegelsville, Bucks County, across a north and south highway known as the Lackawanna Trail, he

was seriously injured by the automobile of the defendant, traveling north on the east side of the road. His suit for damages resulted in a verdict in his favor in the sum of $2,041.70, but the court below, under date of March 12, 1934, entered judgment for the defendant, notwithstanding the verdict; the present appeal is by the plaintiff from that judgment.

When the testimony of plaintiff and his witnesses is examined in the light most favorable to him, it discloses evidence from which a jury could reasonably find these facts. The accident happened about half past five on the afternoon of Sunday, May 15, 1932; the weather was clear and the road dry. Plaintiff lived with people by the name of Weiss, who owned property on each side of the highway, the dwelling house being located some distance back from the road and upon its western side. Shortly before the accident, plaintiff, leading a three year old child by the hand, started from the dwelling house to go to the portion of the land on the opposite or eastern side of the highway. When he reached its western edge, he turned north and continued along that side to a rock opposite an opening, or lane, in a hedge, ten to twelve feet high, growing along the eastern side of the road. The highway at this point is 24 feet in width from gutter to gutter, having a tarvia cartway, 20 feet wide, with gravel shoulders. The road is straight for a distance of approximately 250 feet south of the point at which plaintiff attempted to cross and then curves to the east. When Miller reached the point at which he intended to cross from the western to the eastern side of the road, he "waited for an opening in the traffic so [he] could get through." His testimony with respect to the condition of traffic when he started to cross and with relation to the circumstances under which he was injured reads: "Q. When you started to cross did you see any cars coming? A. There was

a car coming both directions, you know. I waited for the southbound traffic until that was gone, and then I could go across, the road was clear. Q. Did you look to see if any cars were coming? ...... A. I wouldn't have crossed if I had seen a car coming. Yes, I looked. Q. Which way? A. Both ways. Q. Did you or did you not look for cars after you started to cross? A. Why, I kept on looking, you know, all the time while I was crossing. Q. Which way is both ways? A. Both ways, going and coming. Q. What happened while you were crossing? A. I was hit by an automobile. Q. Where were you when you were struck? A. Well, I was half way across. No cars in sight then, you know. ...... Q. Did you say that you did or did not see the car that struck you? A. I didn't see it, no. It wasn't there when I went across, bends in the road.''

The injuries to the child were not serious but plaintiff was knocked violently to the roadway; he was unconscious and lay across the northbound lane of traffic with his head toward the western side of the road. His hearing had been impaired for a number of years prior to the accident but he could engage in ordinary conversation; his age was about seventy-three and his eyesight normal.

The automobile which struck plaintiff was owned by the defendant who was seated in the front seat along with his chauffeur. The accident happened within the limits of the borough and warning signs reading, ''Twenty Mile Speed Limit,'' were erected both south and north of its scene, the nearest one to the south being about 400 feet from the opening in the hedge. There was no proof, however, that they had been erected in accordance with the provisions of the statute. Defendant's car was the only one in the immediate vicinity at the time of the accident. When it came to a stop it was entirely off the cartway and

pointing eastward with the front in the Weiss field; the right side was in the opening in the hedge and the left in the hedge, with the rear wheels in the gravel gutter. The running board on the left side of the car had been crushed up against its body in passing through the hedge. Miller lay in the road about five feet to the rear of the car.

As the automobile came around the curve the driver and occupants of its front seat had a clear view along the eastern half of the road for a distance of at least 250 feet. There was a mark on the road, described as a "burn mark," made by the left rear wheel of the car and extending from a point on the eastern half of the highway northeastwardly to the edge of the "tarvia road" and thence to the rear of the car as it rested in the gutter. The length of this mark upon the improved portion of the roadway was 75 feet and its entire length 90 feet. One witness described it "Like a burn mark, like as if the man was sliding his wheel;" another, in reply to the question "what sort of marks did you see?" answered, "Well, where the wheel drug over the tar, sort of drug the tar up and made it look real black, blacker than the other part of the road, just left a mark in the road;" a third said, "It started out lightly and it burned very heavy right up to the end of the tar, the paved highway."

The version of the accident as given by defendant's driver, and corroborated by defendant and his wife, who was the third occupant of the front seat of the automobile, was to the effect that as he drove around the curve and into the straight portion of the highway his vision along the south lane of travel was so obscured by several southbound cars that he did not see plaintiff and the child until he was within from 35 to 45 feet of them. At that time plaintiff was crossing the first or western half of the road. According to defendant, he was looking towards the approaching

car, but when asked whether he continued to look that way, his reply was, "No, my last impression was of him with his head down a little bit with the boy, trying to get the boy across the street, looking towards sort of down and across that way, across the street." The defendant added that plaintiff was "trotting, running, trying to get across."

An excerpt from the driver's testimony reads: "Q. Now, just what was [plaintiff's] location in the road when you first saw him? A. I should say that he hadn't quite reached the center of the road. Q. And what did you do when you saw him? A. I blew the horn and applied the brakes at just about the same time. Q. And what happened, where did you drive to? A. I first swerved to the right to avoid him, and then saw an opening in the hedge and made for that. We didn't quite get into the opening in the hedge, the left-hand side of the car striking the northern edge of the hedge. Q. Do you know whether you hit him? A. No, sir, I didn't see the man struck. Q. Did you feel any collision? ...... A. No, sir. Q. Do you know of your own knowledge whether you struck him? A. I didn't see him struck. Q. Where was he after your car stopped? A. He was slightly north lying in the road, slightly north of the rear wheels, which were resting on the highway. Q. Did you know that he had been injured or struck before you got out of your car? A. No, sir. Q. When you first saw him what way was he looking? A. He was looking in front of him, with his head slightly down as he ran. Q. Just before you went into the hedge on which side of your car was he? ........ A. He was on the left." Insofar as the versions of the accident conflict, we must for present purposes accept that of the plaintiff.

The driver and occupants of the automobile agree in the statement that they were driving about thirty-five miles an hour and were going faster at the time

of the accident than while coming through the southern portion of the borough.

When asked about the "burn" made by the car, the driver said: "There was some such mark."

The respective contentions of the parties with relation to the negligence of defendant's driver and contributory negligence upon the part of plaintiff were submitted to the jury fairly and adequately in a charge to which only one specific exception was taken, viz., to the refusal of defendant's point for binding instructions.

The judgment n. o. v. seems to have been entered largely upon the theory that if plaintiff looked to the south, as he testified he did, he must have seen defendant's car approaching at a rapid speed and, in the language of the court below, "the case [therefore] falls within the rule that it is idle for a man to say that he did not see a danger when, if he had looked, he must have seen it."

Another ground stated by the court below is that "the evidence does not show that the defendant drove into the plaintiff any more than it shows that the plaintiff walked into the defendant's car."

The case is a close one, but we are convinced, upon a review of the entire record, that it was for the jury. In our opinion, there was evidence from which a jury could reasonably conclude that defendant's driver did not have his car under control to the extent demanded by the circumstances and that plaintiff was struck by its side or rear as it plunged from the road into the hedge; nor do we think that the only inference reasonably deducible from the evidence is that plaintiff must have seen the car if he looked before committing himself and the child to the crossing of the eastern half of the road.

When considering the question of the negligence of defendant's driver, it is to be noted that the place

at which plaintiff crossed was neither a designated crossing for pedestrians nor was it in the closely built up portion of the borough, but the driver did not know whether or not there was a crossing around the curve which he was approaching. He had passed a warning sign shortly before reaching the curve, but drove around it at a rate of speed exceeding fifty feet a second, and would have reached and passed the scene of the accident within five seconds if he had not suddenly been confronted with the emergency. Under his own statement, that he did not see plaintiff until he was within 35 to 45 feet of him, the accident must have happened within a couple of seconds. Several questions and answers during his cross-examination indicate the rapidity of events: "Q. You had to act and think quickly, of course, and the whole thing did happen almost instantaneously, didn't it, your seeing Miller, applying your brakes, blowing your horn, landing in the hedge, it was almost instantaneous, wasn't it? A. During the time it would have taken the car to travel that far. Q. But it was so quick that you couldn't count it in seconds, could you? A. I wouldn't say that."

As said by our Supreme Court in Galliano v. East Penn Electric Co., 303 Pa. 498, 154 A. 805, and repeated in the recent case of Shoffner v. Schmerin, 316 Pa. 323, 175 A. 516: "It is the duty of the driver of a motor vehicle at all times to have his car under control, and having one's car under control means having it under such control that it can be stopped before doing injury to any person in any situation that is reasonably likely to arise under the circumstances." Manifestly, one driving a car around a curve, even in the outskirts of a borough, is bound to know that pedestrians may be upon or crossing that portion of the highway which lies beyond the curve and out of sight. It is equally true that a pedestrian cannot, with

impunity, walk or stand on a roadway in the face of a vehicle which he sees, or, by the exercise of due care, would have seen, approaching him. He must act as a reasonably prudent person would act under like circumstances. Cf. Koppenhaver v. Swab, 316 Pa. 207, 174 A. 393, and cases there cited.

In view of the circumstances to which we have referred with respect to the location of the curve, and to distances and speed, we are not prepared to agree with the court below in the statement that plaintiff must have seen defendant's car if he looked south before starting over the eastern half of the road; at least that inference, depending as it does upon a matter of seconds, does not arise so clearly, under all the evidence, that the trial court was justified in declaring plaintiff guilty of contributory negligence as a matter of law. A jury could reasonably find that the car had not actually rounded the curve when he started across the middle line of the road. With full instructions concerning the principles of law applicable to the evidence, the jury convicted defendant's driver of negligence and acquitted plaintiff of having contributed in any way to the accident. They were not bound to accept the defendant's theory that the driver of his car had no opportunity to see plaintiff until he was within approximately 40 feet of him, or the statement that his speed did not exceed thirty-five miles an hour. They probably gave considerable weight to the silent, but significant, evidence afforded by the tire burn, which, by its length and location, indicated the driver had seen plaintiff 90 feet from the point at which he was struck, but was unable to stop in time to avoid the accident. We cannot say that a jury should not be permitted to conclude that the driver could have stopped his car within that distance if he had it under control to the degree required by his inability to see ahead for any considerable dis-

tance, by reason of the curve, and by the other circumstances under which he was driving. Speed is not the only element that enters into the question of negligence.

No two cases are exactly alike on their facts. We think this case is ruled by the principles stated at length by our Supreme Court in Anderson v. Wood, 264 Pa. 98, 107 A. 658, rather than by the cases cited by the court below and by counsel for the defendant.

The judgment is reversed and record remitted to the end that judgment may be entered on the verdict.